## Hanna's Election Contest.

*Election law—Contest—Status of petitioners—Married women—Tax paid by husbands—Act of May 19, 1874—19th Amendment of Federal Constitution—Act of July 15, 1897.*

1. It is sufficient, in the case of a contest for a county office, such as the office of sheriff, that the petitioners are qualified electors of any district in the county, and that they voted therein at the election contested.

2. It is not necessary, under the Act of May 19, 1874, P. L. 208, that the petitioners be qualified electors of the particular district in which the cause of contest arose, or in which it is alleged that acts of fraud and irregularity were practiced.

3. The payment of an occupation or poll tax with the money of the taxable, at his request, by another person, without a written and signed order of the elector, as required by the Act of July 15, 1897, P. L. 276, will prevent the taxable from voting on a tax receipt which he acquired in such a manner. It is, therefore, immaterial whose money paid the tax in such case.

4. The Act of 1897 is not to be so strictly construed as to exclude married women because of the use of the masculine "his" in the 2nd section.

5. The adoption of the 19th Amendment of the Constitution of the United States enfranchised women by giving them, so far as the right to vote is concerned, precisely the same rights as men.

6. The effect of the amendment is to strike from the Constitution of Pennsylvania the word "male" as used in defining who are or may become electors.

7. The Act of 1897 applies to women, although it was passed many years before the right of suffrage was given to them, inasmuch as statutes framed in general terms apply to new cases as they arise.

8. Although the Act of 1897 applies generally to women, it does not, in view of the relation of husband and wife, apply to a case where the husband pays for his wife her occupation or poll tax without written and signed order by her authorizing him to do so.

Application of the respondent that rule on him to answer be discharged, and that petition be quashed and proceedings dismissed. Q. S. Clinton Co., Jan. Sess., 1924, No. 13.

*A. F. Ryon* and *John B. Myers*, for petitioners.

*M. E. Haggerty* and *Henry Hipple*, for respondent.

BAIRD, P. J., Jan. 9, 1924.—The principal petition in this case purports to be signed by thirty-three qualified electors of the election district of the Borough of Mill Hall, in said county, who voted at the election held Nov. 6, 1923, and is sworn to by five of them. On its face it meets the requirements of the law in respect to the number and qualifications of the signers and affiants in such case. Attached to the said petition is another one, which purports to be signed by eleven qualified electors of various wards and districts of the City of Lock Haven, in said county, who voted at said election. The principal petition is made up of twelve paragraphs containing the allegations upon which the contestants rely, and additional paragraphs praying for the relief sought, which in the main is for a decree that the return of the Return Board

of Clinton County, certifying that Roy M. Hanna was elected to the office of sheriff, is false, and that Harrison R. Johnston was duly and legally elected to said office. The first paragraph of the principal petition alleges that the petitioners are now and were on Nov. 6, 1923, qualified electors of the election district of the Borough of Mill Hall. The attached petition contains, *inter alia*, the following averment:

"That we, as co-petitioners, believe and aver that all of the statements, averments and allegations contained in paragraphs 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 and 12 of said petitions (referring to the petition which we have designated as the principal one) are true as alleged therein, and we expect to prove them at the hearing of this complaint; and that we join with our said foregoing co-petitioners in asking that all things be granted as prayed for in the prayer set forth in said petition."

The application of the respondent to discharge the rule on him to answer and to quash the petition and dismiss the proceedings—upon which a rule to show cause was granted—avers that the petition is defective and not as required by the Act of May 19, 1874, P. L. 208, for the following reasons:

"*(a)* Because the affidavit attached to said petition is defective and does not have the requisite number of signers required by said Act of May 19, 1874, P. L. 208, in that Catharine Agnew, one of the signers to said petition, who, in addition, subscribed to the affidavit attached thereto, was and is not a qualified elector of Mill Hall Borough, in that she did not within two years prior to Nov. 6, 1923, pay a county or State tax as required and in the manner provided by law.

"*(b)* The said petition is defective, in that it does not have the signatures of the number of qualified electors of the election district of Mill Hall Borough required by the Act of May 19, 1874, P. L. 208, in that the following petitioners, viz., Orpha Irvin, Minnie J. Harber, Beulah Johnson, Georgiana Snook, Bertha Davis, Mrs. S. C. (Mary) Davis, Laura Grenoble, Catharine Agnew, Beulah Parker, Mrs. H. A. (Hattie) Karcher, Mrs. A. (Hattie) Pricklemeyer, Mary Straub and Violet E. Agnew, were not and are not now qualified electors of the election district of the Borough of Mill Hall, in that neither they nor any of them, being twenty-two (22) years of age and upwards on Nov. 6, 1923, paid a State or county tax as required and in the manner provided by law within two years prior to Nov. 6, 1923."

All of the alleged acts of fraud and irregularity upon which the contest is based are charged to have been committed in the election district of the Borough of Mill Hall. The second of the reasons assigned for quashing the petition and dismissing the proceedings seems to assume that only qualified electors of that district may sign the petition originating the contest. We do not so understand the act regulating the proceedings in contested election cases, namely, the Act of May 19, 1874, P. L. 208. The number and qualifications of the signers in each of the several classes of elections which may be contested are fixed by the 18th section of said act. The number of signers required in the case of a contest for an office of the fourth class, to which the office of sheriff belongs, is twenty-five, and the qualification required of them, which is common to all classes, is that they be "qualified electors who voted at the election contested." There is nothing in this language which makes it necessary that the petitioners be qualified electors of the particular district in which the cause of contest arose, or in which it is alleged that acts of fraud and irregularity were practiced. It is sufficient, in the case of a contest for a county office, that the petitioners are qualified electors of any district in the county and that they voted therein at the election contested. For support of

this view, see Burke's Contested Election, 22 Pitts. L. J. 193. The principal and attached petition together contain the names of forty-four signers. Of this number, the qualifications of only thirteen have been in any manner assailed. If all of these thirteen names should be stricken off, we should still have thirty-one presumably qualified petitioners, or six more than the number required by the statute. This view assumes that the eleven persons who signed the attached petition are entitled to be counted as petitioners. If there is any objection to such assumption, other than that which may be deduced by inference from the claim that the petition "is defective, in that it does not have the signatures of the number of qualified electors of the election district of Mill Hall Borough required by the act," and which inference, as we conclude, is untenable, it has not been made known to the court, and we have been able to discover none. Upon this ground alone, if necessary, we would overrule the second reason assigned for quashing the petition, &c.; but we shall, as a matter of caution, examine it later in the light of the aspect which the case would assume if there were before us no other petition than that of the electors of Mill Hall Borough.

The first reason assigned for discharging the rule on the respondent to answer, &c., is based on the Act of July 15, 1897, P. L. 276, and the contention made thereunder by the respondent at the hearing was that Catharine Agnew, one of the necessary five affiants, was not a qualified elector because, in violation of the terms of said act, her occupation taxes, which were the only taxes paid by or for her within two years prior to the election, were paid by her husband without her written and signed order authorizing such payment to be made. The fact that Mrs. Agnew did not give her husband a written order authorizing the payment of her taxes by him was admitted by counsel for contestants at the hearing, and the fact that he did pay her taxes by his personal check is not only undisputed, but admitted, although both testified, under objection, that the fund in bank, while derived solely from his earnings, she having no separate income, and deposited in bank to his individual credit, was, by reason of an agreement between them of long standing, their joint property, and that he paid her taxes at her suggestion and by her verbal authority and direction out of this fund. We overruled objections to testimony relative to ownership of the fund and to verbal directions, &c., given by Mrs. Agnew, and received such testimony subject to future consideration of its admissibility. We now conclude, in view of the decision in Corydon Township Election, 236 Pa. 588, that such testimony was irrelevant and should receive no consideration by the court, and it will not. Similar testimony given by other witnesses in an effort to justify the payment without written order, by their husbands, of the occupation tax of certain married women, whose right to sign the petition was challenged on that ground, was likewise admitted subject to future consideration. For the reason given, all such testimony will be ignored by the court in arriving at its decision of the principal questions submitted for its determination.

The Corydon case holds that the payment of an occupation or poll tax with the money of the taxable at his request by another person without a written and signed order of the elector, as required by the Act of July 15, 1897, P. L. 276, will prevent the taxable from voting on a tax receipt which he has acquired in such a manner. It is, therefore, immaterial whose money was used to pay the tax in such case, nor is the transaction relieved of its unlawful character in any case falling within the scope of the act by reason of the fact that the payment was made by one person for another at the request of the latter.

Hanna's Election Contest.

One of the arguments advanced on behalf of the contestants is that because the Act of 1897 is a penal one, it must be construed strictly, and that because of the use of the masculine pronoun "his" in the 2nd section, it cannot be construed so as to include women. If this were the law, women, who now share the right of suffrage with men upon equal terms, would be entitled to all the privileges of an elector without incurring the corresponding obligation to observe very many of the laws relating to elections which have been enacted to safeguard the purity of the ballot. That they do enjoy such privileges, and that without enabling legislation, by virtue of the 19th Amendment to the Constitution of the United States, is everywhere recognized. The adoption of the 19th Amendment enfranchised women by giving them, so far as the right to vote is concerned, precisely the same rights as men: Butler's Application, 23 Dauphin Co. Reps. 277. The effect of the adoption of the 19th Amendment is to strike out of the Pennsylvania Constitution and laws the word "male," so that now the State Constitution in reality reads: "Every citizen twenty-one years of age possessing the qualifications (enumerated in it) shall be entitled to vote at all elections:" Schaffer, Attorney-General, in The 19th Amendment, 29 Dist. R. 715. "The said amendment by its own force and effect strikes from section 177 of our State Constitution the word 'male,' as used in defining who are or may become electors, as well as where used in other parts of our organic or statutory laws, when used in connection with the right and qualification to vote, and also strikes therefrom the use of the masculine pronoun wherever it appears, so as to make the same include and applicable to both sexes:" Graves v. Brubank (Ala.), 87 So. Repr. 587. Other cases and opinions might be cited, but it is unnecessary. The proposition, so far as the most diligent inquiry has enabled us to discover, is nowhere disputed. The election laws of Pennsylvania are thickly dotted with masculine pronouns. In order to keep within reasonable bounds, we shall mention only some of them which are penal in character. Section 99 of the Act of July 2, 1839, P. L. 519, provides that if any person elected to serve as inspector or judge . . . shall neglect . . . to attend on the day of election, . . . he shall . . . forfeit the sum of twenty dollars. Section 100 of the same act provides that if any inspector, judge or clerk shall neglect . . . to take upon himself the duties of such office, he shall forfeit and pay the sum of fifty dollars, &c. Section 101 of the same act provides that if any inspector, judge or clerk . . . shall presume to act in such capacity before taking and subscribing the oath required, . . . he shall, on conviction, be fined in any sum, &c. Section 1 of the Act of May 19, 1887, P. L. 126, provides that if any election officer or assessor of poll taxes shall become intoxicated during any of the time in which he shall be engaged in the performance of his duties, he shall, on conviction, be deemed guilty of a misdemeanor and be sentenced to an imprisonment, &c. Section 102 of the aforesaid Act of July 2, 1839, provides that if any inspector, judge or clerk . . . shall be convicted of any wilful fraud in the discharge of his duties, . . . he shall undergo an imprisonment, &c. Under section 108 of said act, if an assessor shall intentionally neglect or refuse to assess any citizen . . . who is . . . subject to assessment by law, . . . he shall, on conviction, be fined in any sum, not less than fifty nor more than two hundred dollars.

Women may and do in many districts occupy the offices mentioned in these statutes. Are they not, as such officers, liable to the penalties therein provided if they fail to observe the requirements of such laws, or their conduct is at variance therewith, simply because the word "he" is used to describe the offender. To ask the question seems to be to answer it. Section 19 of the Act

of Jan. 30, 1874, P. L. 32, 40, provides that any person who shall, on the day of any election, visit a polling-place in any election district in which he is not entitled to vote, and shall use any intimidation or violence for the purpose of preventing any officer of election from performing the duties required of him by law, or, &c., . . . such person shall be deemed guilty of a misdemeanor, &c. Section 20 of the same act, *inter alia*, provides that if any one shall vote, or attempt to vote, on any certificate of naturalization not issued to him, he shall be guilty of a misdemeanor, &c. Section 8, article VIII, of the Constitution provides that any person who shall give, or promise to give, to an elector any money, reward or other valuable consideration for his vote at an election, . . . and any elector who shall receive, or agree to receive, for himself or for another any money, &c., for his vote at an election . . . shall thereby forfeit the right to vote at such election, &c. Notwithstanding this constitutional inhibition, does a woman offering or receiving a bribe retain her right to vote because she is a woman? Section 6 of the Act of April 29, 1903, P. L. 338, 349, provides that a voter who shall allow his ballot to be seen by any person, with the apparent intention of letting it be known how he is about to vote, . . . shall be guilty of a misdemeanor, &c. May a woman, because she is a woman, ignore the provisions of this act with impunity? Similar instances of the use of the words "he," "him," "his" in penal statutes relating to elections might be multiplied almost indefinitely. Are women voters exempt from their provisions? We think not. "In the reasonable interpretation of statutes, the words 'he,' 'his' and 'him' have repeatedly been held to include women as well as men:" Owens *v.* Haines, 199 Pa. 137 (140).

Another argument made against the application of the Act of July 15, 1897, P. L. 276, to women is that it was passed many years before the right of suffrage was given to them, and that they were not, therefore, within the contemplation of the legislature at the time and cannot be brought within it by the change which has been wrought in their status in this respect. The same argument apparently was advanced against women being selected as jurors in Com. *v.* Maxwell, 271 Pa. 378, but it was there held that the designation "qualified elector" in the Act of April 10, 1867, P. L. 62, requiring jury commissioners to select a jury "from the whole qualified electors" of the county, embraces all electors at the time jurors are selected from the body of the electors, and also all those who have been added to the electorate from time to time. "Statutes framed in general terms apply to new cases as they arise, and to new subjects that are created from time to time, and which come within their general scope and policy. It is a rule of statutory construction that legislative enactments in general and comprehensive terms, prospective in operation, apply alike to all persons, subjects and business within their general purview and scope coming into existence subsequent to their passage:" 25 Ruling Case Law, 778; Com. *v.* Maxwell, 271 Pa. 378.

We would not, therefore, exclude women as a class from the operation of the Act of 1897 for either of the reasons thus far considered. The question, to our mind, must be confined within much narrower limits. It is: Is a wife who votes on a receipt for an occupation tax paid for her by her husband, without a written and signed order by her authorizing him so to do, an illegal voter? She is if the Act of 1897 applies in such case (Corydon Township Election, 236 Pa. 588), but in considering this question we must have regard for the spirit of the act and the mischief which it was intended to remedy. We cannot better state the case than it has been stated by Judge Archbald in Thomas's Election, 14 York Leg. Record, 65. He said: "The mischief which

the act was intended to meet was the indiscriminate and wholesale payment of poll or occupation taxes by campaign committees of the several political parties. This was indulged in to such an extent, particularly in our large cities, that thousands of our lowest classes of voters were dependent for their right to vote on the taxes so paid for them, and their votes were thus virtually controlled by those who held the receipts. The practice became so notorious that no one can pretend ignorance of it, and it was, beyond question, that which prompted passage of the law. It is to be kept in mind in construing it. There certainly is no object to be attained by applying the act where the wife pays the taxes of the husband, with his money, at his own door, to the collector who is on his rounds to gather them; not only is she the natural agent of the husband in any personal or domestic matter, but she is so identified with him in the eyes of the law that they are often regarded as one person. To say that she cannot pay his taxes, if they happen to be poll or occupation taxes, without a written authority from him, under penalty of being convicted of a misdemeanor, seems absurd, and we are safe in saying that no such idea was in contemplation when the act was passed; it is not within its mischief, and while it may be contrary to its strict letter, it does not violate its spirit, and we will not so construe it."

With these views we entirely concur. Of course, at the time Judge Archbald so wrote women did not enjoy the right to vote; but had they then had that right, and had the situation of the parties been reversed, as it is here, there is no reason to suppose that his opinion would have been different. Indeed, there is even greater reason for excluding from the operation of the act a case where a husband pays his wife's tax without a written order than where a wife similarly placed pays her husband's tax. If she is his natural agent in matters of personal and domestic concern, he is that, and more, to her; he is her natural protector and provider. Very few married women have any separate income or estate. Mrs. Agnew has none. The payment of her occupation tax has become a necessity. By a recent act of assembly she may be imprisoned for the non-payment of it. In order to prevent such a humiliation to her, must her husband, for want of such an order, pay the tax for her, assuming that he would be permitted by the tax collector to do so, at the risk of fine or imprisonment? If the words of the act are to be given their literal meaning, there is only one answer to the question. To such an absurdity may the insistence upon an all-embracing construction of the act be carried. It is true that Judge Stewart, in Lerch's Contested Election, 15 Northamp. Co. Repr. 272, where a wife had paid her husband's taxes, reached a conclusion contrary to that of Judge Archbald; but as he has not given us the benefit of the processes by which he arrived at it, considered separately from other instances of the payment by one person of another's taxes without a written order, we are unable to measure the weight which should be attached to his opinion.

The case principally relied upon by the proponents of the rule to quash, &c., is Corydon Township Election, 236 Pa. 588. So far as the Act of 1897 is concerned, this case holds, as digested in the first paragraph of the syllabi, that the payment of an occupation or poll tax with the money of the taxable at his request by another person without a written and signed order of the elector . . . will prevent the taxable from voting on a tax receipt which he has acquired in such a manner. Notwithstanding the generality of this language, which we think fairly summarizes the opinion of the court on this point, we cannot bring ourselves to believe that it controls, or was intended to control, every case which falls within the strict letter of the act. In that case the

votes of four male electors were rejected because in each instance an occupation tax was paid by some other person than the respective elector, and none of the persons paying the said tax presented to the collector, at least thirty days prior to the date of holding the said election, any written and signed order of the elector authorizing such payment to be made. It does not appear by whom the payment was made in any instance. If, in any instance, payment was made by the wife of an elector, it does not seem probable that this circumstance would have escaped all comment whatever or have been entirely disregarded as of no consequence. We, therefore, conclude that the precise question involved in this case, namely, the effect of the payment of a wife's occupation tax by her husband without a written order, or, rather, the analogous case of the payment of a husband's tax by his wife, without such order, was not considered in the Corydon case.

The spirit and remedial character of the Act of 1897 is recognized by Mr. Justice Moschzisker in the Corydon case in language very similar to that used by Judge Archbald. He said (page 591): "The Act of July 15, 1897, P. L. 276, was no doubt passed to remedy a public evil which had come into existence through the wholesale purchase of tax receipts by organized political parties, contrary to the intent of the Constitution·that each elector should pay a tax. The object of the act was to see that each elector should in good faith pay such taxes with his own funds."

We are safe in saying, therefore, that the payment by Rev. Agnew of his wife's occupation tax did not violate the spirit of the Act of 1897. Closely allied to the doctrine of the equitable construction of statutes, and in pursuance of the general object of enforcing the intention of the legislature, is the rule that the spirit or reason of the law will prevail over its letter. Especially is this rule applicable where the literal meaning is absurd, or, if given effect, would work injustice, or where the provision was inserted through inadvertence. Words may, accordingly, be rejected and others substituted, even though the effect is to make portions of the statute entirely inoperative. So the meaning of general terms may be restrained by the reason or spirit of the statute, and general language may be construed to admit of implied exceptions: 36 Cyc., 1106-9. When necessary to effect the legislative intent, remedial statutes will be construed to include cases within the reason, although outside the letter of the statute, and to exclude cases within the letter, but outside the reason: 36 Cyc., 1175. Statutes are to be construed so as may best effectuate the intention of the makers, which sometimes may be collected from the cause or occasion of passing the statute, and where discovered, it ought to be followed with judgment and discretion in the construction, although the construction may seem contrary to the letter of the statute: Big Black Creek Impt. Co. v. Com., 94 Pa. 450; Duffy v. Cooke, 239 Pa. 427; Turbett Township v. Port Royal Borough, 33 Pa. Superior Ct. 520 (525). The literal construction of a statute has, in general, but a *prima facie* preference, and where it appears that the mischief and the remedy contemplated warrant and require a construction according to the narrow, instead of the broader, meaning that may be attached to the words, that·construction should be adopted. The effects and consequences of the proposed construction of a law, as well as its reason and spirit, will be looked into in determining the legislative intent, which is the criterion by which all acts must be construed: Ritter v. Wray, 45 Pa. Superior Ct. 440. It is a settled rule of construction that the legislature will be presumed to have intended what is reasonable and effectual and not what is productive of absurd and anomalous consequences, or what is impossible or incapable of execution. If, in giving to the words of an act their

literal or natural meaning, the conclusion reached would be unreasonable or absurd, some other meaning within the reasonable scope of the words may be adopted to avoid that result, if it appears that such other meaning may probably have been the one intended: In re Foster's Petition, 243 Pa. 92. "Language is rarely so free from ambiguity as to be incapable of being used in more than one sense; and to adhere rigidly to its literal and primary meaning in all cases would be to miss the real meaning in many. If the literal meaning had been given to the laws which forbade a layman to lay hands on a priest, and punished all who drew blood in the streets, the layman who wounded a priest with a weapon would not have fallen within the prohibition, and the surgeon who bled a person in the street to save his life would have been liable to punishment: *Endlich on Interpretation of Statutes*, § 25;" Jermyn's Election Expenses, 57 Pa. Superior Ct. 109 (114).

We conclude that Mrs. Agnew was a qualified elector when she voted at the election held Nov. 6, 1923.

Recurring now to the second reason given by the respondent for quashing the petition, &c., we find that of the thirteen persons to whom exception was taken, at least nine of them did in fact and in law pay a county tax as required and in the manner provided by law, within two years prior to Nov. 6, 1923. The occupation taxes of Catharine Agnew, Orpha Irvin, Georgiana Snook, Laura Grenoble and Mrs. H. A. (Hattie) Kerchner for 1922 were paid for them by their respective husbands more than thirty days and within two years prior to Nov. 6, 1923. This, we hold, as indicated in our discussion of the qualifications of Catharine Agnew as an affiant, qualified them to vote at the said election. Beulah Parker personally paid a county tax for 1921 on Dec. 17, 1921; she was qualified. Mrs. S. C. (Mary) Davis and Mrs. A. (Hattie) Pricklemeyer each paid, or caused to be paid for them, within the statutory period required to qualify them as electors, a county tax levied on real estate. It is conceded by the respondent that they were qualified to vote. A receipt for the payment of a county tax by Minnie Harber on Oct. 27, 1922, was offered in evidence. Nothing in reference to the manenr of payment of this tax was shown; she was qualified. This exhausts the list of names to which exception was taken, except Beulah Johnson, Bertha Davis, Mary Straub and Violet E. Agnew. Nothing was shown in regard to the payment or non-payment of a tax by Bertha Davis. The evidence in regard to the payment of a tax by Beulah Johnson left the question in doubt. Mary Straub paid a county tax levied on property assessed in the name of the estate of her deceased husband and in which she had an interest. Violet E. Agnew, being more than twenty-two years of age on Nov. 6, 1923, never paid a State or county tax; she was disqualified. Without considering the status of Beulah Johnson, Bertha Davis or Mary Straub, it appears, as before stated, that at least nine of those to whom exception was taken were qualified electors on election day. The principal petition, on which all of these names appear as signers, is signed by thirty-three persons in all. Deducting the four last mentioned from this number, we have left thereon at least twenty-nine signatures of *prima facie* qualified electors. We, therefore, conclude that the principal petition is sufficient in and of itself, so far as the number of qualified signers is concerned.

Now, Jan. 9, 1924, the rule to show cause why the rule granted on Roy M. Hanna, respondent, to answer should not be discharged, and why the petition should not be quashed and the proceedings dismissed, is discharged. The respondent may have ten days in which to answer the petition.

From W. E. Shaffer, Lock Haven, Pa.